Arnold McCullough and Robert Wilson, Plaintiffs in
Error,

*v.*

State of Tennessee, Defendant in Error.

392 S.W.2d 954.

(*Nashville,* December Term, 1964.)

Opinion filed July 30, 1965.

WILLIAM C. WILSON, Nashville, for plaintiffs in error.

GEORGE F. McCANLESS, Attorney General, MARNE S. MATHERNE, Assistant Attorney General, for the State.

MR. JUSTICE HOLMES delivered the opinion of the Court.

The plaintiffs in error, hereinafter referred to as defendants, were convicted of grand larceny. The jury fixed their punishment at confinement in the State Penitentiary for a period of not more than ten years. They were sentenced accordingly. The Trial Judge overruled their motion for a new trial. They have duly perfected their appeal to this Court and have assigned errors.

The first three assignments of error relate to the suffiency of the evidence to sustain the conviction. They are:

"(1)  The evidence preponderated in favor of the defendants.

"(2)  No trespass was ever proved, nor any other element of larceny.

"(3)  According to the preponderance of the proof the prosecutor entered into a gambling game with the defendants and lost his money, thereby eliminating any element necessary to constitute the offense of larceny."

Only one witness testified for the State concerning the facts surrounding the alleged larceny. He was the prosecutor, Arthur Chatman, a 70 year old negro tenant farmer. He testified that on March 3, 1964, he went to the town of Springfield about the middle of the morning. He had $40.00 with him, $25.00 of which he deposited in the First National Bank at Springfield. He stated that when he came out of the bank he had his deposit receipt, his check book, his bank book with the Security Federal Savings & Loan Association of Springfield, and $15.00, all of which were in one of his overall pockets. He had on deposit in the Security Federal Savings & Loan Association the sum of approximately $3,400.00.

He further stated that, as he started to go home, a stranger called to him and asked if he knew the location of the Stone Hotel. He replied that he did not. This stranger then engaged him in conversation and told the prosecutor he had given a woman $20.00 and she had promised to meet him at the Stone Hotel. The prosecutor then advised the stranger there was no hotel in town by that name and that he might just as well forget about his $20.00. Thereupon the stranger pulled out what appeared to be a large roll of money and said, "Well, I got plenty of money, I don't worry about $20." This stranger was later identified as one Bubba Robertson.

While he was talking to Robertson, the two defendants, who were then strangers to the prosecutor, came up and joined in the conversation. By the promise of money, the prosector was persuaded to get in the automobile of the defendant McCullough with Bubba Robertson and the defendants. The prosecutor testified that, while in the automobile, the defendant McCullough took the prosecutor's $15.00, his Savings & Loan bank book, his First

National Bank check book, and the receipt for the $25.00 deposit from his pocket. After seeing the amount of the prosecutor's deposit in the Savings & Loan Association, McCullough refused to return his bank book to the prosecutor unless the prosecutor paid him $100.00.

The prosecutor testified that the defendants and Robertson "hoodooed" him and got his money. He testified repeatedly they did something to him. He stated, "* * * thatun right there (referring to McCullough) pushed right up against my back—that's when they done somethin' to me."

After they insisted on the $100.00 in exchange for his bank book the prosecutor asked them to drive him home, which they did. He stated he went in his house long enough to turn around, and his wife told him, "You act like you are crazy." He got back in the automobile with the defendants and Robertson. They drove to the Security Federal Savings & Loan Association where McCullough accompanied the prosecutor while he obtained a check for $3,000.00. The prosecutor then went to the First National Bank and cashed this check. He got back in the automobile and the defendant Wilson took the $3,000.00 from the prosecutor after they drove off. On a subterfuge the defendants and Robertson got the prosecutor out of the automobile. They then departed Springfield, and the prosecutor went to the jail to report he had been robbed.

The following testimony of the prosecutor illustrates his contention as to why he did the things he did:

"Q. Well, did they put some sort of spell on you?

"A. They made me feel bad. Done that.

"Q. Well, I realize you felt bad about losing $3,000—

"A. I didn't feel bad about losing the $3,000, but they done somethin' to me. Come up to me and done somethin' to me. I'm tellin' you the truth. I'm tellin' you the dead truth. They done somethin' to me. If they hadn't done somethin' to me, they'd never a-got that money. They'd had to kill me.

"Q. Were you out of your mind?

"A. No, if I'd had my right mind—if I'd had my right mind, they wouldn't a-got my money.

"Q. Then you are saying, then, that you were out of your mind?

"A. They wouldn't a-got that money.

"Q. Will you answer my question there—were you out of your mind?

"A. There's somethin' wrong with me but I don't know what's wrong. There's somethin' wrong.

"Q. Now, are you able to remember everything that happened?

"A. Yes, I know what they done about the money, yes, sir."

When the prosecutor was asked if he had not handed the money to the defendants he testified as follows:

"A. No, I didn't hand it to 'em. This boy took the money out of my hand. No, I didn't—no, I didn't hand it to 'em.

"Q. Well, why didn't you make your deal right there in the bank with them instead of getting back in the car again?

"A. I didn't know what I's doin'. Then—was—I didn't know what I's doin'."

The prosecutor denied that he at any time gambled with the defendants or Bubba Robertson and denied that he played cards with them at any time. He further testified that these parties at no time played cards in his presence.

The State also offered the testimony of one Sonny McKissack, who testified that he was approached on the streets of Springfield that same day by the defendants in much the same way the prosecutor was approached, and that at no time did the defendants suggest gambling or playing cards.

Both of the defendants testified in their own behalf. Their testimony is accurately summarized in the brief of the defendants, as follows:

"Each related a scheme whereby they went to Springfield, Tennessee for the express purpose of playing Three Card Monte with anyone they found, and each related that they had a prearranged plan whereby one of their party, referred to as 'Bubba', would pretend that he was a stranger in town looking for a hotel referred to as the Stone Hotel, and that he, Bubba, had a large sum of money, recently collected as the result of an insurance claim, which he flashed in front of Chatman, and that Bubba had given Twenty ($20) Dollars to a woman who had disappeared she having agreed to meet him at the Stone Hotel. This, of course, was a scheme to allow the prosecutor to see that Bubba, the alleged ignorant country bumpkin, had a large sum of money and was looking for a good time, and would be an easy mark for persons of superior mentality. According to each of the defendants, Bubba agreed to pay Ten ($10.00) Dollars to Arthur Chatman and to Robert Lee Wilson, if they would take him to

the 'good time house' allegedly operated by a Mrs. Hall. Each of the defendants testified that Arthur Chatman agreed to gamble with the man called Bubba, using three cards, two of which were black and one was red, the game being played by switching the cards backwards and forwards and the person doing the betting to bet that he could pick the red card. Chatman was to lose two times and then he was to begin winning inasmuch as the red card was always to be placed closest to Chatman's leg. After having won a larger sum of money than he, Chatman, had, Chatman agreed to go get his bank book at his home in order to convince Bubba of his financial worth, and that he would pay off in the event that he, Chatman, lost. Subsequently, a large sum was wagered and Chatman, believing that he had a sure thing, failed to pick the right card, losing his money to Bubba. Each of the defendants testified that in order to get rid of Chatman, they entered into a scheme whereby the money was to be hidden before they went to a 'good time house'. Secretly they told Chatman to go back and get the money; he agreed, joining them in a fraudulent scheme to deprive Bubba of his money. Each testified, of course, that Bubba did not place the money by the post, which is, of course, the old handkerchief drop trick. Each of the defendants testified that they were professional card manipulators, that this was a purposeful scheme and that it could not be worked unless the victim joined them in attempting to beat Bubba, one of their number who posed as a country bumpkin, and that it required a person with larceny in his heart to fall for the scheme.''

It should be added that the defendant Wilson testified he was in the penitentiary when the case of *Metcalf v.*

*State,* 205 Tenn. 598, 329 S.W.2d 824, was decided by this Court. He testified that he knew the defendants in that case and was familiar with the fact that the Court there held that the taking of money by playing Three Card Monte did not constitute larceny.

It thus appears that the testimony of the prosecutor and that of the defendants is diametrically opposed on the issue of whether the defendants got the prosecutor's money by playing Three Card Monte or took his money from him as claimed by the prosecutor. There can be no doubt that the testimony of the prosecutor, if believed, shows all of the elements of the crime of larceny.

In *Metcalf v. State,* supra, the Court discussed the earlier case of *Defrese v. State,* 50 Tenn. 53. In so doing, the Court stated:

"The Court held, at page 61, that Defrese was guilty of larceny, and stated the rule to be that 'when it is made apparent that some stratagem or artifice has been fraudulently used to acquire the possession' of the property intended to be fraudulently appropriated, then the offense of larceny is complete" 205 Tenn. at 601, 329 S.W.2d at 825.

In *McBee v. State,* 213 Tenn. 15, 372 S.W.2d 173, the Court stated:

"When the evidence of the State and the defense is diametrically opposed, it is the duty of the jury to arrive at the truth of the situation." 213 Tenn. at 24, 372 S.W.2d at 178.

In McBee, the following familiar rules are restated and numerous authorities supporting them are cited:

"It is well-settled in this State that a conviction in a criminal case will not be reversed on the facts unless it is shown that the evidence preponderates against the verdict and in favor of the innocence of the accused." 213 Tenn. at 19, 372 S.W.2d at 176.

"It is also well-settled in this State that the verdict of the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflict in favor of the theory of the State. Such verdict also removes the presumption of innocence of the accused and raises a presumption of his guilt and puts upon him, here, the burden of showing that the evidence preponderates against the verdict and in favor of his innocence. (Citing cases)

"In reviewing the record on appeal from a conviction it is the law of this State 'that the credibility of the witnesses and the conflicts in their testimony have been settled by the verdict of the jury which has been approved by the trial court.'" 213 Tenn. at 20, 372 S.W.2d at 176.

In the brief of the defendants it is stated, "In this case the testimony of the defendants is pitted against the testimony of the prosecutor and the State failed to carry the burden of proof beyond a reasonable doubt."

■ Under the foregoing rules it was for the jury to determine whether or not the State had shown the guilt of the defendants beyond a reasonable doubt. The Trial Judge fully and fairly gave in charge to the jury the contentions of the respective parties. In so doing, the Trial Judge stated:

"The theory of the Defendants is that, on the occasion in question, they and another man, called Bubba, in-

duced the prosecutor to gamble with them on a card game called 3-card monte and that during the course of this gambling the prosecutor lost his $3,015 by gambling and that they did not take or steal anything from him. If you believe this theory to be true, or if you have a reasonable doubt as to its truth, then you should acquit the Defendants, and your verdict should be not guilty.''

The first three assignments of error are overruled.

Assignments number four and five state that the testimony of the prosecuting witness was so incoherent and unintelligible as to be incapable of being transcribed and that the Court should have appointed an interpreter for the prosecutor. Since the court reporter was able to transcribe the testimony of the prosecutor, these assignments are abandoned in defendants' brief. They are overruled.

By assignment number six it is stated the Court committed error in refusing to instruct the prosecuting witness to answer the questions of defense counsel and that the answers when elicited were not responsive.

It is true that on both direct and cross examination the answers of the prosecutor were not always responsive to the question. A reading of the testimony of the prosecutor shows that he was uneducated and was quite excited at times during his examination. The parts of his testimony which we have quoted above show the manner in which he testified. His cross and recross examination consume some 27 pages of the record. By the exercise of patience the Trial Judge was able to have him answer the questions asked by defense counsel, and he was fully cross examined. There is no merit in this assignment of error.

By assignment of error number seven it is stated that the panel of jurors from which the defendants were forced to choose a jury consisted of only fourteen names, none of whom were of the colored race.

The bill of exceptions does not show that any objection was made to the panel before the jury was accepted. It reflects that only one prospective juror was peremptorily challenged by defense counsel. The bill of exceptions shows both the State and the defendants accepted the jury without objection being made. This assignment is not argued in defendants' brief. It is overruled.

Assignment number eight asserts that the verdict was so excessive as to indicate malice and caprice upon the part of the jury. The maximum punishment for grand larceny is fixed by T.C.A. sec. 39-4204 at imprisonment in the penitentiary for not less than three years nor more than ten years. The jury fixed the punishment at the maximum allowed by law. In *Ryall v. State,* 204 Tenn. 422, 321 S.W.2d 809, the Court stated:

"The punishment imposed upon the defendant by the jury was within the limits allowed by the law. This did not indicate passion, prejudice and caprice."

Each defendant was sentenced to serve ten years in the State Penitentiary. The sentence of the defendants will be modified so as to provide that each defendant is sentenced to serve not more than ten years nor less than three years confinement in the State Penitentiary in conformity with the Indeterminate Sentence Law.

All of the assignments of error are overruled. The judgment of the Trial Court is affirmed except as modified to conform to the provisions of the Indeterminate Sentence Law.

NOTE: This opinion was prepared by MR. JUSTICE ANDREW O. HOLMES and approved by all members of the Court prior to his death on July 24, 1965, and was released by the Court on July 30, 1965.