WILLIAM LOUIS GREER and HENRY J. DUNBAR,
Plaintiffs in Error, v. STATE OF TENNESSEE,
Defendant in Error.

Court of Criminal Appeals of Tennessee. May 9, 1969.

Certiorari Denied by Supreme Court Aug. 4, 1969.

408

Hugh W. Stanton, Jr., Memphis, for plaintiffs in error.

George F. McCanless, Atty. Gen., Robert H. Roberts, Asst. Atty. Gen., Nashville, Arthur T. Bennett, Asst. Dist. Atty. Gen., Memphis, for defendant in error.

## OPINION

WALKER, Presiding Judge.

The defendants below, William Louis Greer and Henry Dunbar, were convicted of robbery and sentenced to not more than ten years in the penitentiary. Each was also separately indicted for carrying a pistol; these cases were tried with the robbery case and resulted in their convictions and fines of $50, respectively. They have appealed all three cases.

The State's proof shows that about midnight on December 19, 1967, William Thomas Colbert, a bus driver for the Memphis Transit System, stopped his bus at the end of the line to change its destination sign before returning to the garage; a Negro identified by him as Greer rapped on the door and entered; Dunbar was about three feet behind Greer. After asking the driver if he was going downtown, Greer told him, "Come clean with me," and robbed him of about $60, a money changer and some other articles of personal property. Greer had a blue revolver with an odd shaped barrel which he aimed at Colbert's head and threatened to kill him. Greer wore tinted sunglasses and a dark coat. Dunbar had a chrome plated revolver and stood on the steps at the entrance to the bus. It was well lighted and Colbert was able to see both defendants clearly and to describe them to the officers. When he reported the robbery, he told the officers that he could identify the defendants.

In addition to the dark sunglasses, Colbert noticed Greer's complexion, age, height, approximate weight; and that he wore a narrow brim brown hat, yellow trousers and dark jacket. That night he estimated Greer's

height at six feet and his weight at 180 or 190 pounds; at the trial he thought Greer weighed perhaps as much as 220 pounds; another witness at the trial estimated it at 200 pounds.

Colbert was closer to Greer than Dunbar, and it is obvious that his description of Greer was better than that of Dunbar. He described Dunbar as about 35 years of age and of dark complexion and also described his hairline. He could not describe his clothes, but he says he could not forget the features of Dunbar's head.

Lieutenant J. M. Dunigan, a detective of the Memphis Police Department, received the case about 8:00 A.M. on December 20, 1967. The description of one of the robbers fit Greer perfectly. After Dunigan read that description, he sent officers to the area where Greer could usually be found, but they did not find him there. Lieutenant Dunigan and another officer went to Greer's home and arrested him. At the time of the arrest, Lieutenant Dunigan searched for articles connected with the robbery and found a pair of sunglasses on the mantel and a dark heavy duty shirt. This shirt was introduced into evidence and in the trial is called a dark coat or dark jacket.

When Dunigan arrested Greer, he advised him of his rights under *Miranda* and again advised him of those rights in an automobile as they were driving to the police station. On the way there, Greer admitted he robbed Colbert, said that Dunbar was his accomplice and gave the street and location of Dunbar's house. The Court sustained Dunbar's objection to any statement about him and the Court had Dunbar's name omitted

from the oral confession. In the absence of the jury, the Court considered the statement implicating Dunbar on the issue of probable cause for his arrest.

When they arrived at police headquarters, Lieutenant Dunigan sent officers to the Edith Street location given by Greer as Dunbar's residence. They arrested Dunbar, who was in his shorts at that time. These officers advised him of his *Miranda* rights and asked for identification. The defendant opened a dresser drawer for that purpose, and the officers saw in it four .38 caliber bullets. They took these as evidence as well as a .38 caliber revolver found under the mattress. This revolver had an odd shaped barrel and was of an unusual type. At the trial Colbert identified it as the revolver used by Greer. The other revolver was not found.

Each defendant contends that his arrest and search were illegal. They rely principally on Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

The defendants were arrested without warrants, and the determination of these questions depends upon whether or not there was probable cause for their arrests. An arrest without a warrant must be based on probable cause when it is predicated upon the commission of a felony. T.C.A. Sec. 40-803. Jones v. State, 161 Tenn. 370, 33 S.W.2d 59; Fox v. State, 214 Tenn. 694, 383 S.W.2d 25; Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142.

There is no question that a felony had, in fact, been committed. When Lieutenant Dunigan read the robbery report, he knew that the description fit Greer; he had

had previous experience with Greer and knew that he wore sunglasses at all times, both day and night. Here we have the undisputed fact of a recent robbery and a detailed description of the robbers, particularly Greer, by the victim and the knowledge of the detective from his experience with Greer that the description fit him.

In determining probable cause, all the information in the officer's possession, fair inferences therefrom, and observations, including past experience, are generally pertinent. 5 Am.Jur.2d, Arrest, Sec. 48; 6 C.J.S. Arrest § 6(c), p. 601.

Lieutenant Dunigan also knew of an anonymous telephone call from an informer implicating Greer in the robbery. This defendant says that this information was worthless. We think that probable cause existed for the arrest without consideration of this tip, but that an informant's tip, even that of an anonymous informant, may be added to the mix which will later be viewed for a determination of the existence of probable cause. Mills v. United States, 90 U.S.App.D.C. 365, 196 F.2d 600; De Bruhl v. United States, 91 U.S.App.D.C. 125, 199 F.2d 175. Although information received from anonymous informants is not alone sufficient to constitute probable cause for an arrest, it may be considered along with other facts and circumstances known to the officer. People v. Currier, 232 Cal.App.2d 103, 42 Cal.Rptr. 562 (1965); People v. Macknic, 257 Cal.App.2d 370, 64 Cal. Rptr. 833 (1965); Martin v. State, Fla. App., 194 So.2d 291 (1967).

In Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the United States Supreme

Court found that the informant's tip there had not been sufficiently corroborated but nevertheless went on to say:

"This is not to say that the tip was so insubstantial that it could not properly have counted in the magistrate's determination. Rather, it needed some further support."

In short the Court held in that case that the tip could be considered, but when linked to the other information the total did not reach probable cause.

In Fox v. State, supra, our Supreme Court quotes, with approval, the rule laid down in Jones v. State, supra, for an arrest without a warrant:

" 'The substance of these provisions is that an officer may lawfully proceed to arrest without a warrant any person when the officer has, with reasonable cause, been led to believe that a person has committed, is committing, or is about to commit a felony. It is essential to the protection of society that a wide discretion be vested in officers chosen to enforce our laws against felonies. It is impossible to define "reasonable cause" in terms to fit all cases arising. Each case must stand on its own facts. A narrow construction would open the way for the escape of desperate criminals and the defeat of justice. One too liberal would lead to the harassment of the innocent. But the officer may not be required to wait for assurance, for evidence which would convict; when circumstances fairly point to a felony it is his duty to act, and act promptly.' "

Reasonable cause is such as would justify a

reasonable man in believing that the particular person arrested was guilty of a felony. The facts and circumstances and the information on which Lieutenant Dunigan acted was sufficient to warrant a prudent man in believing that Greer had committed the robbery of the bus driver. The arrest was, therefore, lawful.

Since the arrest was lawful, the search was lawful as an incident to a lawful arrest. One who is lawfully arrested may be searched in his person or premises without a warrant, provided the search is incident to the arrest. White v. State, 210 Tenn. 78, 356 S.W.2d 411.

In his confession, Greer told the officer that Dunbar was his accomplice and described the house and its location on Edith Street. There was no question that the robbery had taken place. Lieutenant Dunigan had information such as would justify a reasonable man in believing Dunbar had committed a felony.

In dealing with probable cause, we must depend on the factual and practical considerations which reasonable and prudent men, not legal technicians, act. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.

Wong Sun v. United States, supra, does not sustain the contentions of either defendant that his arrest was illegal. In that case one Hom Way was arrested by federal narcotics agents and told them that he had bought an ounce of heroin from a person known to him as "Blackie Toy," proprietor of a laundry on Leavenworth Street. That street ran for thirty blocks. Without a warrant, officers went to the laundry of one James Wah Toy, broke open the door and arrested him. Nothing in that

record identified the defendant James Wah Toy and "Blackie Toy" as the same person. The Court held that Hom Way's accusation merely invited the officers to roam the length of Leavenworth Street in search of one "Blackie Toy's" laundry; that the name over the door was not that of Toy and there was no information that had narrowed the scope of the search to this particular Toy. The Court held that the description of the suspect was no more than that of a wholesale or "dragnet" search warrant. We have here the correct name of the suspect and a particular description of the location of his home. None of the vagueness of *Wong Sun* appears here, and we do not have the lawless conduct of the police appearing in *Wong Sun.*

The search of Dunbar's room was incident to his lawful arrest. White v. State, supra.

Greer assigns as error his in-court identification by Colbert; Dunbar assigns as error the testimony of Colbert and Dunigan as to a lineup, a confrontation by Colbert after the lineup and Colbert's in-court identification of him.

On the day of the arrest of the defendants, Colbert was called to police headquarters to view a lineup. Both defendants declined to sign a card waiving their rights to an attorney at the lineup. Greer had been represented in another case by Mr. Cordell Hull Sloan, a Memphis attorney, and said that he wanted him for the lineup. Lieutenant Dunigan says he asked Dunbar if he wanted a specific attorney or the public defender, and that he replied that Mr. Sloan was agreeable to him as he was representing Greer. This officer says that Dunbar agreed

for that attorney to represent him at the lineup. Dunbar says he asked for counsel.

Mr. Sloan was acting as a special judge in City Court at the time. An officer came there and told him that a client wanted him to appear at a lineup to see that it was properly held. Mr. Sloan understood that he was requested by Greer to attend the lineup; no one told him that Dunbar had requested him or that he was expected to represent his interests. He knew Greer but did not know Dunbar.

This attorney sat in the rear of the auditorium and viewed the lineup. He says that he saw nothing wrong with it. From all the proof, the lineup was fair and not improperly suggestive. Colbert identified the defendants from the six participants. After the lineup, the attorney talked to Greer and advised him not to make any statement to the officers. Greer says Mr. Sloan also told Dunbar to remain silent. It is obvious, however, that this attorney did not consider that he represented Dunbar at the lineup. He discussed financial arrangements with Greer but was not employed.

The trial judge overruled both defendants' objection to the lineup and permitted the evidence of it to be presented to the jury.

■ We think that Greer's in-court identification was proper and his assignment is without merit. Colbert testified that he could identify the defendants from the time of the robbery. Greer was represented by counsel at the lineup and it complied with the requirements of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S.

263, 87 S.Ct. 1951, 18 L.Ed.2d 1178. There was also no prejudice to Greer by the trial judge permitting him to be identified in court by the victim of the robbery.

As to Dunbar, the proof showed that an attorney was present at the lineup but not on his behalf. The attorney testified that he had never heard of Dunbar, did not remember seeing him and was there at the request of his codefendant. In this case there was no compelling reason for not providing counsel, this attorney or another, for Dunbar and meeting *Wade-Gilbert-Stovall* standards.

██ ██ In *Wade,* supra, the Supreme Court held that a pretrial confrontation, such as a lineup or a showup, was a "critical" stage in the prosecution of a defendant and that, therefore, it was a violation of a defendant's right to assistance of counsel, preserved by the Sixth Amendment of the Constitution, to conduct such a confrontation in the absence of defense counsel. In *Gilbert,* supra, the Court made clear that testimony regarding the illegal confrontation itself must be barred at trial in all cases:

> "The State is therefore not entitled to an opportunity to show that that testimony had an independent source. Only a per se exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup. In the absence of legislative regulations adequate to avoid the hazards to a fair trial which inhere in lineups as presently conducted, the desirability of deterring the constitutionally objectionable practice must prevail over the undesirability of

excluding relevant evidence. Cf. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R. 2d 933. That conclusion is buttressed by the consideration that the witness' testimony of his lineup identification will enhance the impact of his in-court identification on the jury and seriously aggravate whatever derogation exists of the accused's right to a fair trial."

The Court, however, did hold that in-court identification, and other forms of identification testimony, such as testimony relating to incidents occurring prior to the tainted confrontation, would be admissible at trial if the government proved that such testimony was not the "fruit" of the illegal confrontation, but, instead, was produced from an independent, untainted source. See *Wade,* supra.

■ Since confrontation for identification is a "critical stage" of pretrial proceedings, requiring the presence of counsel unless waived, Colbert's out-of-court identification of Dunbar at the lineup on December 20, 1967, was violative of his constitutional right to counsel and evidence of it was incompetent. Dunbar did not knowingly and intelligently waive his right to counsel. No testimony of the complaining witness as to the identification at the lineup could be used at the trial. The fairness of the confrontation does not insulate it from the *Wade* and *Gilbert* holdings. A trial court reviewing a challenged pretrial confrontation is not to inquire whether that confrontation was conducted in a fair or unfair manner, but, rather, is to inquire only whether that confrontation occurred at a "critical stage" of the prosecution. If so, regardless of the demonstrated fairness of the confrontation, if defense counsel is not present for an accused at the confrontation, identification

testimony which is the fruit of that confrontation must be barred at trial.

■ The lineup identification of the victim violated Dunbar's constitutional rights to the assistance of counsel under the Sixth and Fourteenth Amendments and rendered evidence of such out-of-court identification incompetent at the trial. Likewise, his in-court identification is incompetent unless it can be shown to have had an independent origin and did not result from the illegal out-of-court confrontation. Wong Sun v. United States, supra.

■ In determining the admissibility of his courtroom identification of Dunbar, the test is whether, granting the primary illegality of his out-of-court identification, the in-court evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, supra. More simply stated, if the in-court identification had an independent origin, it is competent. If it resulted from the illegal confrontation at the lineup, it is incompetent because denial of counsel requires its exclusion. See State v. Wright, 274 N.C. 84, 161 S.E.2d 581 (1968); State v. Mentor, Mo., 433 S.W.2d 816 (1968). That question should be decided by the trial court on an examination out of the presence of the jury at the next trial, if the State again offers Colbert's in-court identification. The trial judge should there make his own determination as to whether the State can "establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." United States v. Wade, supra.

For the reasons discussed, Dunbar's assignment challenging the lineup and his in-court identification is sustained. His remaining assignments may not arise again, and we refrain from discussing them at this time. We do, however, call attention to Greer's confession implicating Dunbar. Before the jury the witness left out all reference to Dunbar by name. A letter was substituted for him, but the statement admitted before the jury gave the street location of Dunbar's house. Even though the statement referred to "X," the jury could easily read into it the name of this defendant.

The evidence abundantly sustains Greer's convictions. He has not shown that the evidence preponderates against the verdicts and in favor of his innocence. Schweizer v. State, 217 Tenn. 569, 399 S.W.2d 743. We have considered all his assignments of error and find them without merit.

The judgment in the felony case does not specify the minimum term. The minimum term fixed by law for the offense of robbery is five years and becomes, in effect, a part of the judgment. T.C.A. Sec. 40-2708. Greer's sentence for robbery will be modified to provide that he is sentenced to not less than five nor more than ten years. Leek v. State, 216 Tenn. 337, 392 S.W.2d 456; McCullough v. State, 216 Tenn. 513, 392 S.W.2d 954.

With this modification, Greer's sentence for robbery is affirmed; his sentence for carrying a pistol is also affirmed.

The judgments as to Dunbar are reversed and the cases as to him are remanded for new trials.

OLIVER, J., concurs.

GALBREATH, Judge (dissenting).

I must respectfully dissent. To do otherwise would encourage, as I believe the majority opinion will, the indiscriminate and wholesale rounding up by the police of classes or groups of people that may fit vague, uncertain, general descriptions given by a victim of a personal crime. The defendant, William Louis Greer, was arrested solely because of a description of one of the bandits in the case given by the victim and acted upon by Lt. J. M. Dunigan of the Memphis Police Department. This description was in the officer's words, "male, colored, 23 years old, six foot, 180 pounds, medium brown complexion, wearing sun glasses." It later developed from testimony of the State's witnesses that Greer, at least at the trial, weighed between 200 and 220 pounds. So, a most important part of the description, one that the average person can usually estimate rather accurately, was erroneous. Of course, the defendant could have gained a great deal of weight, but if he had, this does not appear in the record.

The description given by the victim was so general that it could have fit hundreds, perhaps thousands, of men in the Memphis metropolitan area of almost a million people with a Negro population of hundreds of thousands. The officer himself said that the sun glasses was the particular item that brought his attention to Greer as he had, coincidentally, known Greer for some time and "had never observed him when he wasn't wearing sun glasses, day or night."

Not only do a significant number of people, because of visual sensitivity, wear dark glasses but it is well

known that many perpetrators of personal crimes wear such a masking device to obscure from witnesses their identity. Even more prevelant is the custom on the part of young people, particularly, of the Negro race, in this generation to wear such "shades," as they are called, in their imitation of well known musicians and entertainment personalities, such as Ray Charles, Sammy Davis, Jr., and others whom have caused dark glasses to become a badge of the "in-crowd."

While the fact that the bandit wore dark glasses, coupled with the fact that Greer wore dark glasses, should have afforded the officer a clue from which further investigation should have been mounted, it presented no more basis for probable cause to arrest than would have information that the robber was wearing a derby hat; perhaps not as much so as derby hats have become much rarer in our time than have sun glasses.

The anonymous telephone call referred to by Lt. Dunigan could not have been considered in the determination that he had probable cause to arrest Greer, or in this Court's view of the legal question involved. The robbery was committed about midnight between December 19th and December 20th. The telephone call referred to by Lt. Dunigan that brought Greer to mind was received, not by him, but by someone else who told him about it on the 20th. As Lt. Dunigan phrased it in his testimony. "I did not personally receive this call. I became aware of this information on the 20th. It could have come in a day or so prior * * *" "* * * I think it possibly (sic) there was some connection with several other offenses which of course are not being brought out." All doubt as to the insufficiency

of the information before Lt. Dunigan must be swept away by his own testimony in which he candidly admitted he had no reasonable information on which to base an arrest. He answered in the affirmative when asked, "On this arrest * * * you were actually playing a hunch."

I trust we have not arrived at a police state condition in which private citizens may be arrested on hunches. True, this power, if given to police, would undoubtedly solve a great many crimes. If the police in Memphis had gone out in force and arrested every Negro man that they could find who wore dark glasses, chances are they would have solved many other unconnected crimes then under investigation. The fact that this time the hunch paid off should not blind us to the fact that many such hunches would prove worthless and subject many innocent citizens to the type of harassment forbidden by the Fourteenth Amendment to the United States Constitution.

In the case relied upon by the majority in upholding the reasonableness of the arrest in this case, Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed. 2d 637 (1969) the F.B.I. had the following facts upon which the Government unsuccessfully sought to base probable cause:

(1) The defendant had been shown going to and from a room in an apartment which contained two telephones listed under the name of another person. (The crime suspected was that of gambling and it is well known that a number of telephones in a single room is an essential part of the 'tools of the trade' of the bookmaker.)

(2) The defendant's car had been observed parked in the apartment's parking lot.

(3) The F.B.I. had been informed by a reliable informant that the defendant was accepting wagering information by telephones—the particular telephones located in the apartment * * *.

(4) The defendant was known by federal and local law enforcement agents as a bookmaker * * *.

The information outlined above pointing the finger of suspicion at Spinelli was much more suggestive than was the fact that the crime before us was committed by a young Negro male wearing dark glasses and that Greer was a young Negro male who wore such glasses.

And yet the U.S. Supreme Court held:

"We conclude, then, that in the present case, the informant's tip—even when corroborated to the extent indicated—was not sufficient to provide the basis for probable cause."

The tip in the instant case, coming prior to the commission of the crime, and being as Officer Dunigan stated, unconnected with the crime involved in this prosecution had no more weight than the baseless hunch which caused the defendant's arrest.

What would have been the reaction of a magistrate if an officer from the Memphis Police Department had applied for a warrant for the arrest of every Negro man in his mid-twenties in Memphis who wears dark glasses? The answer to that question will suggest graphically the

reason why I dissent to that part of the opinion holding the validity of William Louis Greer's arrest and the subsequent fruits deprived therefrom to be legal.

I would concur with all other parts of the opinion.