**STATE of Tennessee, Appellee,**

v.

**Arthur Gary VOLTZ, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

Oct. 15, 1981.

Permission to Appeal Denied by Supreme Court Dec. 28, 1981.

William M. Leech, Jr., Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Nashville, John L. Williams, Dist. Atty. Gen., Huntingdon, Robert P. Smith, Asst. Dist. Atty. Gen., Savannah, Billy Blow, Asst. Dist. Atty. Gen., Lassiter, Jones & Logan, Sp. Prosecutors, Huntingdon, for appellee.

Edward Witt Chandler, Memphis, for appellant.

## OPINION

WALKER, Presiding Judge.

Convicted of first degree murder and sentenced to life imprisonment, the appellant, Arthur Gary Voltz, appeals to this court. At trial, he relied on the defense of insanity. He insists that the evidence does not support the finding of the jury that he was sane when the offense was committed or that he was capable of premeditation. We have examined all of the issues presented and find no reversible error. We therefore affirm the conviction.

The appellant, age 31, and the deceased Cynthia Epperson, age 21, a nightclub dancer, had lived together for about 18 months in the Outlaw Motorcycle Club in Memphis. On February 29, 1980, they were returning from Nashville with the appellant driving her Oldsmobile automobile. Shortly after crossing the Tennessee River on Interstate 40, between 11:00 p. m. and midnight, the appellant stopped on the shoulder behind a parked moving van driven by Richard Mosley, accompanied by his 17-year old son Bryan.

Approaching Mr. Mosley, the appellant told him: "I am a German general; I want my orders; I have a flakey broad with me, and I am going to kill her." He also asked, "Are there any choppers in the area?" The Mosleys could see a woman and a dog in the car. On the appellant's return to the car, they saw the flashes and heard about five shots. The appellant asked Mr. Mosley, "Should I dump her here or down the road?" The appellant then drove off rapidly.

At a truck stop near Jackson, the appellant spoke to Mr. Eddie Redmon who was driving a car with an antenna for a CB radio. When Mr. Redmon told him that he was a truck driver and had to be back in Memphis for work, the appellant replied that he was also a truck driver and had to be back at work. He followed Mr. Redmon into Memphis at a high speed. In Memphis Mr. Redmon got out of his car and inquired why the appellant had followed him. The appellant responded that he was going to Tutwiler. At that time Mr. Redmon noticed the dead woman in the car. The appellant told him, "You don't know nothing."

The appellant parked the car containing the body on Tutwiler and walked about two blocks to the Outlaw Motorcycle Club, kicking the door to enter. There he wrapped the pistol and put it in a trash bag before getting the keys to the club president's automobile and driving to a drainage ditch

to dispose of the weapon. After returning to the club, he took a quantity of the drug "THP" and went to sleep.

The following morning, March 1, in response to a report that a dead woman was in an automobile, officers went to the car and found the victim and a letter to her father in Knoxville with her return address at the club. A motorcycle jacket and motorcycle gloves were also in the car. With this information pointing to her address, Sergeant Boswell of the Memphis Police Department, in plain clothes, and a number of uniformed officers went to the club. After Sergeant Boswell knocked on the door and asked to see the club president, that club official admitted him and the other officers. They learned that the appellant and deceased lived together and that he was the last person seen with her when they left in her car the previous day. Voltz was arrested as a "material witness" and other residents, three men and three women, were asked to come to police headquarters. One resident was left in charge of the club.

At 5:15 p. m., Sergeant Hammers found the appellant alert and in good shape and talked to him after *Miranda* warnings. The appellant, however, said that if he were locked up and allowed to sleep he would be able to tell more. The next morning, March 2, he was again advised of his rights and made a statement. Although neither of these statements were introduced into evidence, he gave a complete confession that afternoon and signed it. The statement in question and answer form is clear and in detail. It was presented to the jury. The appellant said that he and the victim, whom he called "Leah", left Memphis to go to Knoxville to see her parents and ask permission to marry; that they changed their minds in Nashville and started back to Memphis; that they crossed the Tennessee River and pulled behind a truck; that he told the driver that he needed help and asked the driver to help if he shot Leah. The appellant said he shot Leah about five times. He accounted for his stop near Jackson and following Mr. Redmon to Memphis. He said that the $2000 found on his person had been earned by Leah, and he was saving it for her. He explained his disposal of the pistol and an earlier call to the clubhouse from near Nashville to report that he would be back for guard duty there. He also recalled that the van driver had asked him to report to the next service station that the van was disabled.

When the Benton County sheriff and two TBI agents on March 2 returned the appellant to Benton County, he agreed to show them where the killing took place and where he began to follow the car with the CB antenna. He did this and also said that he first shot the victim in the forehead but did not think that he killed her; that he "screwed up" the first time and might as well "screw it up good." Sheriff Shannon testified that the appellant appeared rational to him and a number of state's witnesses likewise considered him normal and sane.

Dr. Alvin J. Summar, a psychiatrist practicing in Jackson, examined the appellant in jail for an hour and a half on May 24, 1980, and testified that at the time of the offense the appellant was not insane or psychotic unless one includes within the term "mental illness" the altered state of mind resulting from voluntary ingestion of drugs or alcohol.

The appellant was examined at Middle Tennessee Mental Health Institute between June 23 and August 8, 1980. Dr. Robert Glen Watson, a clinical psychologist on the staff that observed him, was of the opinion that he was competent for trial and not judicially committable; that he had no mental disease, was not psychotic and had no brain damage, but that at the time of the shooting he was suffering from a delusional disorder brought on by the fact that he had voluntarily ingested amphetamines and PCP (phencyclidine) for a period of seven years. A delusional disorder, in Dr. Watson's view, is a drug reaction, not a mental disease. Although he did not believe the appellant legally insane because he

was not suffering from a mental disease, he felt that because of his delusional disorder he was unable to appreciate the wrongfulness of his conduct and was unable to conform his conduct to the requirements of the law.

The appellant did not testify.

Dr. John Randolph Gonzalez, a forensic psychiatrist and the clinical director of the Middle Tennessee Health Institute, also participated in the evaluation of the appellant at that facility. The appellant gave him a history of chronically taking amphetamines and phencyclidine for the past seven years and particularly a week before this incident, although he had had no drugs from around 2:00 a. m., February 29, until after the incident. He told the psychiatrist that he felt that the car was "bugged" and that he heard German music on the radio; that he thought he was lucky on the way back to Memphis, to get across the Tennessee River bridge before it was blown up, and thought he saw an army truck and men unrolling "det. cord." He asked the driver what his orders were, telling him that he was a Nazi general and inquiring what he had to do to get his orders, if he had to shoot Cynthia. In the opinion of this expert witness, the appellant suffered paranoid delusions and hallucinations. He was suffering from amphetamine delusional syndrome. In the view of Dr. Gonzalez, the appellant had a psychosis or mental illness which prevented him from realizing the wrongfulness of his acts, and he was substantially incapable of conforming his conduct to the requirements of the law.

An attorney appointed to represent the appellant at the preliminary hearing testified that he visited him in jail on March 3, at which time the appellant explained his defense by drawing a diagram of apparently unrelated words and rhetorical questions.

The appellant insists that the evidence, taken as a whole, will not support a finding of sanity by the standards of *Graham v. State*, 547 S.W.2d 531 (Tenn.1977). The *Graham* standard is:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law."

■ Where the evidence tends to show that a person charged with crime was insane at the time of its commission, as in this case, the burden is on the state to prove that the defendant had the capacity to commit crime under the *Graham* standard. *State v. Patton*, 593 S.W.2d 913 (Tenn.1979). The state's burden of proving sanity can be met by expert testimony, by lay testimony or by showing of acts or statements by the defendant consistent with sanity and inconsistent with insanity. *State v. Patton*, supra; *Edwards v. State*, 540 S.W.2d 641 (Tenn.1976).

■ The value and weight of expert testimony is for the jury. Where there is any conflict between expert testimony as to the facts, the jury is not bound to accept expert testimony in preference to other testimony.

■ Under these rules we find that there is an abundance of evidence upon which a rational trier of fact could be convinced beyond a reasonable doubt of the appellant's guilt and of his sanity. Rule 13(e), T.R.A.P.; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ The evidence further shows that the killing was premeditated. The appellant announced to the van driver and his son that he was going to kill the girl in his car and then repeatedly shot her in the head, neck and arms. After the first shot, which he did not think killed her, he acknowledged that he had "screwed up" and might as well "screw it up good" and fired more shots into the victim. His appearance at the scene was serious and composed. The evidence of drug intoxication is not sufficient to negate specific intent.

■ The appellant next challenges the admissibility of his confession on the grounds that it was the result of an illegal arrest and that it was involuntary. The trial judge held an extensive hearing on the

motion to suppress and found the arrest lawful and all four of appellant's statements admissible. As previously mentioned, the first two statements were not introduced into evidence. The third statement is here in question.

The trial judge correctly held that the officers had probable cause to arrest Voltz. The entry into the club was by consent. The officers learned that Cynthia Epperson, the victim and owner of the car in which her body was found, lived in the motorcycle club with the appellant and had last been seen leaving the house with him in that car. The appellant had a rifle in his bed and a box of .380 caliber ammunition (the same type found in the car.)

When a felony has been committed, an officer may arrest without a warrant when he has reasonable cause for believing the person arrested to have committed it. Reasonable cause is that which would justify a reasonable person to believe that the arrested person is guilty of a felony. *State v. Jefferson*, 529 S.W.2d 674, 689 (Tenn.1975); *Davis v. State*, 2 Tenn.Cr.App. 297, 453 S.W.2d 438 (1970); *Greer v. State*, 1 Tenn. Cr.App. 407, 443 S.W.2d 681 (1969).

The trial judge found all four of appellant's statements voluntary and admissible. The evidence supports his conclusions. The law of confessions made while intoxicated or insane was stated by this court in *State v. Green*, 613 S.W.2d 229 (Tenn.Cr.App. 1980):

"The general rule is that a confession is admissible even though it was made at a time when the accused was under the influence of narcotic drugs or alcohol, if at that time the accused was capable of making a narrative of past events or of stating his own participation in the crime.... We think this rule should apply equally to insanity."

The appellant's first statement, at 5:15 p. m., March 1, was made after *Miranda* warnings and at a time when he did not appear intoxicated. His account of the events indicated that he was trying to cover up his participation in the murder. He said that he had last seen the victim when she let him out at the club at dark; he also said that the last time he saw his pistol was the previous day when he went to the laundry. The evidence likewise shows that the appellant was alert and properly warned when he made his second statement the following morning. The third statement, again after proper *Miranda* warnings, was free and voluntary. No challenge is made to the fourth statement.

Next, the appellant claims the state failed to prove venue in Benton County, specifically that the victim could have been shot elsewhere and have been dead when she arrived in that county. The Mosleys testified that they saw her move and further the appellant took the officers to the scene in Benton County where he said he shot the victim. This issue is meritless.

■ The appellant's complaint that the preliminary hearing was presided over by a nonlawyer general sessions judge is likewise without merit. He relies on *State ex rel. Anglin v. Mitchell*, 596 S.W.2d 779 (Tenn. 1980), in support of his contention. That case specifically sanctioned such determinations of a preliminary nature by nonlawyer judges:

"(N)othing in the holding of this Court precludes a nonlawyer judge from making a pre-trial inquiry designed to determine whether there is a substantial likelihood that a hearing, if conducted, would result in an adjudication of delinquency and confinement."

In *North v. Russell*, 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976), the United States Supreme Court held that an accused, subject to possible imprisonment, is not denied due process when tried by a nonlawyer judge so long as the law allows the accused to be later tried *de novo* before a lawyer-judge.

The *North* rule is directly applicable to the present case because the appellant was bound over to the grand jury by the non-lawyer general sessions court judge, was subsequently indicted, and thereafter entered a plea of not guilty before the circuit judge, a licensed attorney.

Further, the appellant's conviction was based on the subsequent indictment and his conviction was in no way adversely affected by any defects in the earlier preliminary examination.

The appellant complains that the trial court refused to charge his special requests. Since the jury charge is not in the record, we are unable to review these contentions. *Hester v. State*, 562 S.W.2d 214 (Tenn.Cr.App.1977).

Finally, the appellant argues that the district attorney general should have been required to show cause why a special prosecutor was necessary and whether the special prosecutor should have been allowed to argue to the jury.

TCA 8–7–401 allows special prosecutors to participate with the district attorney general or his deputies at the discretion of the district attorney general. There is no requirement that the district attorney general show cause for his participation. The statute requires the district attorney general to make the final and concluding argument. It does not preclude the special prosecutor from arguing before the jury.

All issues have been fully considered and are overruled.

The judgment is affirmed.

TATUM and CORNELIUS, JJ., concur.