IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

APRIL 1998 SESSION

FILED

August 26, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | No. 01C01-9610-CR-00419 |
| Appellee, | * | Davidson County |
| VS. | * | Hon. J. Randall Wyatt, Jr., Judge |
| ADRIAN WILKERSON and STEVEN MURPHY, | * | (Especially Aggravated Robbery, First Degree Murder, Theft) |
| | * | |
| Appellants. | * | |
| | * | |

For Appellant Wilkerson:

Mark F. Fishburn
100 Thompson Lane
Nashville, TN  37211
(at trial and on appeal)

For Appellant Murphy:

Jeffery A. DeVasher
Assistant Public Defender
1202 Stahlman Building
Nashville, TN  37201
(on appeal)

David Baker
Assistant Public Defender
and
Karl F. Dean
Metropolitan Public Defender
1202 Stahlman Building
Nashville, TN  37201
(at trial)

For Appellee:

John Knox Walkup
Attorney General & Reporter

Karen M. Yacuzzo
Assistant Attorney General
425 Fifth Avenue North
Cordell Hull Building, Second Floor
Nashville, TN  37243-0493

Nicholas D. Bailey
and
Katrin Miller
Assistant District Attorneys General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN  37201-1649

OPINION FILED:_____

AFFIRMED AS MODIFIED

GARY R. WADE, JUDGE

<u>OPINION</u>

The defendants, Adrian Wilkerson and Steven Murphy, were convicted of especially aggravated robbery, first degree murder, and theft over $1000.00. The defendants were sentenced to life imprisonment for first degree murder. The trial court imposed Range I sentences of twenty-five years for especially aggravated robbery and four years for theft. All sentences are to be served consecutively, for an effective sentence of life plus twenty-nine years.

In this appeal of right, each defendant presents the following issues:

(1) whether pretrial identification procedures were unnecessarily suggestive requiring suppression at trial; and

(2) whether the trial court erred by instructing the jury on parole eligibility.

The defendant Murphy presents the following additional issues:

(3) whether the evidence is sufficient to support his convictions for especially aggravated robbery and first degree murder during the commission of a felony;

(4) whether the trial court properly admitted a "life photograph" of the victim; and

(5) whether the trial court properly permitted a prosecution witness to testify.

Finally, each defendant challenges the length and manner of his sentence.

We affirm the judgment of the trial court but modify the sentence for especially aggravated robbery as to each defendant.

On the morning of October 6, 1994, the vehicle of Timothy Thomas, a Tennessee State University student, was stolen from the school parking lot. Thomas described the car as a 1984 Oldsmobile Cutlass Supreme, beige in color with maroon wheels and bearing the license plate, "PUZZLED." As he reported the

2

missing vehicle to campus security, he received word that police had found his car. The steering column had been stripped and a screwdriver, which did not belong to Thomas, was found in the floorboard.

Donald Amos, manager of a chain of movie theaters in Nashville, testified that in 1994, he employed Keith Davenport to manage the Rivergate 8 Theater. Davenport conducted daily cash transactions of at least $3,000.00 at Third National Bank. All monies were carried in bank bags labeled "Rivergate 8." On October 6th, a bank employee informed him that Davenport had been robbed. Police recovered $3,891.00 from two bank bags labeled "Rivergate 8."

Rodman Davenport, the father of Keith Davenport, testified that he had received word that his son had been shot during a robbery at Third National Bank. Three hours after his son was transported to Vanderbilt Hospital, he died. Rodman Davenport identified a photograph of his son and pointed out the bullet holes in the vehicle he drove on the date of his death.

Dorothy Seay, who had just cashed a check at the Third National Bank, was returning to her car when she heard a loud noise. She then observed a tan 1984 Oldsmobile Cutlass with a dark roof and a dark bra over the front grill travel from Kroger toward the bank and park in two empty parking spaces near her car. Ms. Seay observed the driver of the Cutlass stop next to a person she later learned was Keith Davenport, who was getting into a small, white car. The driver of the Cutlass, a tall, black man wearing a white shirt and dark pants, exited the passenger door, shot the victim twice, and then stooped to grab the bank bags. When he stood up, he looked at Ms. Seay and drove away from the scene. While she did not see the driver of the Cutlass or its license plate, Ms. Seay insisted that she got a

3

good look at the robber, only twenty to twenty-five feet away. She described the gun as a .44 or .357 magnum with an eight-inch barrel and brown handles bearing two circular emblems.

Ms. Seay provided police with a statement describing the robbery and waited in the bank conference room for a possible identification. Asked to view two men to determine if she recognized either of them from the shooting and cautioned to be very careful in rendering a positive identification, Ms. Seay identified the defendant Wilkerson, who was handcuffed and sitting in the backseat of a police vehicle, as the person who fired the fatal shot. Later, she identified him at the preliminary hearing and then at trial. She could not identify the defendant Murphy.

Estella Parker, a teller at Third National Bank, testified that she heard a gunshot and looked out the bank window. From only fifty feet or so away, she then heard two more shots and saw a man holding a gun and two bank bags enter the open passenger door of a slowly moving car. She described the man as a tall, black man with short hair; he wore a white t-shirt and jeans. Ms. Parker described the car as an older model Cutlass or Monte Carlo, beige or yellow in color with a brown top and dark wheels, and the murder weapon as dark brown with a long barrel. She stated that the victim fell to the ground within two feet of the tall man. Ms. Parker asserted that nothing blocked her view of the incident. At a showup at the bank, she identified the defendant Wilkerson, standing in handcuffs with another man, as the person she saw jump into the car with the bank bags. Although she was unable to identify the defendant Murphy, she recognized the gun recovered by police as that used by Wilkerson in the robbery.

Linda Boone, who was in the Third National Bank lobby at the time of

4

the shooting, heard two pops and saw a man lying on the ground in front of her car. She then observed a black man carrying a "big gun" lean over the victim and remove a bank bag from underneath his arm. The robber then got into the passenger side of a car she described as a 1982 or 1983 beige Cutlass with burgundy top. Ms. Boone could not identify the driver or the person who fired the shots and she could not see the license plate of the Cutlass.

Grady Welch, who was cashing a check at the Third National Bank, heard two gunshots outside the bank, looked out the window and saw a black man wearing a white t-shirt leaning over the victim. He observed the robber reach down for the bag and then run between cars to a beige car with a dark top. Welch could not see the robber's face and could not see the driver of the getaway vehicle. While he followed the car in his truck, he was unable to see the license plate.

Mark Nelson, who was in the parking lot at the time, heard a gunshot followed by two more gunshots. When he saw a woman running in the parking lot toward Kroger, he returned to his car where he saw a cream or beige colored Buick or Regal with tinted windows "flying up the parking lot ...." He could not describe the individuals inside.

Robert Newland, who was leaving the bank just before the shooting, testified that he saw "a unique looking fellow ... black, with red hair" drive by slowly in a tan car. Moments later, he heard gunshots and saw another black man getting into the same tan car. He recalled the red-haired man driving in his direction and saw the license plate "PUZZLED."

Patty Fought, who lives about one mile from the Third National Bank,

5

testified that around noon she was cleaning house when she noticed an older model beige car with tinted windows and a bra over the grill quickly stop in front of her house. She detected a lot of movement within the car and when both car doors opened, a white man with a dark t-shirt and jeans exited on the driver's side. A black man wearing a white t-shirt and jeans exited the passenger door, holding what appeared to be a bundle of material. The two men walked toward Gallatin Road. Ms. Fought went outside and saw the license plate "PUZZLED"; the car was still running. Ms. Fought called police and talked with Bart Pangburn, the UPS driver, about what she had observed. Within an hour, police drove the two to a showup only three blocks away. Ms. Fought, after viewing each handcuffed defendant, identified the two men as the same two men who had stopped their vehicle in front of her house. "I didn't get a good look at their faces when they got out of the car, but I said, they looked like the men that got out of the car. ... [based upon] the clothes they had on, their ... body build and their profile." She positively identified the defendants again at the preliminary hearing. At trial, Ms. Fought identified the defendant Wilkerson as the passenger who exited the car with the bundle and the defendant Murphy as the driver.

While acknowledging that she had never attempted to identify the men from a group, she testified that she had no difficulty in identifying the defendants.

Pangburn testified that he was delivering packages on Gibson Drive at about noon on the date of the robbery when he noticed two men step outside a stalled yellow mid-sized car with brown vinyl roof. He recalled that a man of mixed race, having very light brown skin, braided red hair, and thick eyeglasses, walked ahead of the other man saying, "hurry up." The other man, who Pangburn described as black and tall, walked hurriedly and carried a sweatshirt. Pangburn

6

then drove his truck past the two men and looked in his rearview mirror, recalling that he could see their faces clearly. The man carrying a bundled sweatshirt crossed the street and placed it in a drainage ditch. Pangburn, who then drove around the block, saw the defendants approaching Old Hickory Boulevard. He then saw a police car, stopped, and reported what he had observed. At a showup, Pangburn recognized the men as the same men who exited the stalled car; he expressed no doubt about the accuracy of the identification. Pangburn positively identified the defendants at a preliminary hearing and at trial. He identified the defendant Wilkerson as the man who carried the bundle and the defendant Murphy as the man he had seen walking with Wilkerson.

Just before noon, Officer William Kirby, who had received a radio dispatch that a car suspected to have been used in a robbery had been abandoned on Gibson Drive, found the Oldsmobile with license plate, "PUZZLED," blocking the south lane of traffic. The passenger door was ajar and the steering column had been "peeled" by a screwdriver. He received a description from Ms. Fought: one black and one white male, between twenty-five and thirty years of age; both were about the same height but one was heavier than the other. He recalled that Pangburn, who was also on the scene, similarly described the defendant. Pangburn reported that one of the men, who could have been white or black, had red hair and that a bundle had been left in the drainage ditch.

Officer J.W. Davis, who flies the Metro Helicopter, received a radio call reporting the bank robbery and a description of the suspects. He then saw two black males walking north on Gallatin Road near a Kentucky Fried Chicken; as he circled above, they entered the restaurant. While conceding that the two men were not behaving suspiciously, Officer Davis reported their location and hovered until a

7

patrol car arrived.

Lieutenant Harry Bell, of the Goodlettsville Police Department, was serving a warrant when he overheard a radio dispatch describing the suspects involved in a shooting. Lt. Bell then spotted two men fitting the suspects' description "pushing each other and ... carrying on ... but as they did that they would turn around ... like they were looking to see if someone was following them." Lt. Bell observed the men enter a Kentucky Fried Chicken.

When Officer Melton Elrod entered the KFC restaurant, he noticed a black male sitting at a table with an elderly white man. He described the black male as wearing a white t-shirt and sweating profusely, but not eating. Officer Elrod also saw a light-skinned black male with red hair seating himself at a different table. At that point, the defendants were arrested.

Officer Danny Duncan testified that he handcuffed the defendant Murphy, placed him in the patrol car, and read him his rights. He then drove Murphy to Gibson Drive and the bank for showups. Officer Daniel Lane, who arrested Wilkerson, drove him to Gibson Drive and the bank for showups. During the drive, Wilkerson asked Officer Lane what the charges would be, what kind of bond he would have to make, and whether he would go to state or federal prison. Detective Norris Tarkington also testified that Wilkerson inquired about the possible lengths of sentence for robbery, attempted robbery, and attempted murder.

Officer David Pugh found a sweatshirt hidden in the drainage ditch. Inside were a .357 Dan Wesson Arms revolver and two locked "Rivergate 8" bank bags. The revolver contained three spent cartridges and three live rounds. The gun

8

had unburned powder on the handle and smelled as if it had been fired recently. Officer Pugh found no finger prints on the victim's car but did recover bullet fragments. He lifted two latent palm prints from the Oldsmobile.

Gwen Gregory, who examines latent prints for the Metro Police Department, testified that latent palmprints lifted from the hood of the Oldsmobile matched those of Murphy. Doctor Ann Bucholtz, the Davidson County Medical Examiner, testified that the victim suffered a lethal gunshot wound to his abdomen that pierced his liver and that the wound was surrounded by stippling, indicating the victim was shot at close range. Special Agent Steve Scott of the Tennessee Bureau of Investigation concluded that the bullet fragments found in the victim's car were fired from the Dan Wesson Arms .357 revolver.

I

The defendant Murphy maintains that his right to due process was violated by the suggestive showup on Gibson Drive. He does not challenge the showup at Third National Bank. Wilkerson challenges both of the showups. He claims a due process violation and a deprivation of his Sixth Amendment right to counsel.

(a) Third National Bank Showup

At the suppression hearing, Officer Roll testified that at approximately 12:45 P.M., almost one hour after the robbery and shooting, the suspects arrived at the bank for the showup. Officer Roll interviewed Ms. Seay and Ms. Parker individually and kept them separated throughout the identification process. He informed each as follows:

> [W]e had a couple of individuals that we were bringing to the bank, that I wanted her to realize that just because

9

somebody was at the bank, it wasn't necessarily saying that we were saying they were involved, that -- that she needed to rely on her memory and that -- that she could not feel any kind of pressure .... If it was not the person ... that she saw, then we definitely did not want her to make an identification.

Officer Roll testified that the suspects stood on the sidewalk in front of the bank's one-way windows. According to the officer, Ms. Seay "was very confident about her identification [of Wilkerson]. She said there was no doubt in their mind ...." Ms. Seay did not identify Murphy. Whereas Ms. Parker was "98 percent" certain about the defendant Wilkerson, who was the gunman, she could not identify the defendant Murphy.

Recently, our supreme court ruled that testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Johnny M. Henning, ___ S.W.2d ___, No. 02S01-9707-CC-00065, slip op. at 14 (Tenn., at Jackson, June 22, 1998). At trial, both Ms. Seay and Ms. Parker testified confidently about the accuracy of the identifications.

### (b) Gibson Drive Showup

At the suppression hearing, Officer Sheffield testified that prior to the showup, he told Ms. Fought and Pangburn that "two possible suspects" had been detained. He recalled informing them that they would drive by slowly to see if the "two individuals who were possibly suspects ... were the ones that they observed leaving the area." He denied doing or saying anything that would influence the identification process. As he drove by, each witness looked at the suspects and made a positive identification. Officer Sheffield stated that neither witness was hesitant and that both seemed positive about the identification.

10

At the hearing on the motion to suppress, Pangburn recalled that police drove him up the street because, "[t]hey needed me to identify the people who they thought might have done -- just they thought, you know, were involved in what happened." He recalled that he and Ms. Fought talked about what they had seen and then rode together in the rear of a patrol car to view the suspects. The officer drove slowly and Pangburn was able to see first one suspect and then another. He remembered that he and Ms. Fought identified the men "pretty much simultaneous[ly]." Each suspect was seated in the rear of a patrol car and Wilkerson appeared to be handcuffed.

Ms. Fought recalled that a police officer informed her "that they thought they had the guys they were looking for and wanted us to identify -- see if we could identify them." Her description of the showup was substantially the same as Pangburn's. She admitted talking with Pangburn about what she and he had observed prior to the showup but denied having been influenced by the conversation.

Following the motion hearing, the trial court ruled as follows:

[The showup] that was done at the bank by Detective Roll ... the way [he] handled that matter was textbook fashion. He handled it just exactly the way it should have been. The people were separate from each other when they made the identification. He was very careful, very conscientious and very professional in the way he handled that and the Court found nothing at all about that that was inappropriate. That motion ... was overruled ....
    [As for the showup on Gibson Drive] the matter wasn't handled quite the way it ... could have been ... I think under all the circumstances here that the way these identifications were made and having listened to both of these witnesses here today were done in such a way where they were not unduly influenced .... I think even though they were in the same car, that [Pangburn] testified when they observed these men that they were identified almost simultaneously .... I think that neither attempted to influence the other. ...

11

Neither do I find that the officers attempted to influence the identification. ... [The witnesses] have made the identification, have made it again here today. And the Court is of the opinion they made that identification based on what they observed rather than someone trying to influence them to identify some person.

***

[Applying the Neil v. Biggers factors] I think clearly there was the opportunity of each of these witnesses to view this suspect at the time they said they did. [Ms. Fought] was cleaning her house. All of a sudden a car stops real quick ... in a driving lane in front of her house .... She obviously had an opportunity to look at the person. And she's testified that her identification [comes from] a profile, from the clothing and the body build. ...

[Mr. Pangburn] was obviously very suspicious the whole time. And so I think his attention was on these two people. ...

I think the prior description that they gave was [] accurate. ...

The level of certainty of the witness at the confrontation, I don't think there's any doubt in their minds, then or now, about who these men were .... And the length of time between the crime and confrontation was ... within an hour.

***

I think both of these witnesses made a conscientious, sincere identification based on what they observed, not what someone else said or how they were presented. And your motion on that ground is ... denied.

Our scope of review is limited. A trial court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18 (Tenn. 1996); State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981); Graves v. State, 512 S.W.2d 603, 604 (Tenn. Crim. App. 1973); see Tenn. R. Crim. P. 12(e).

To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification. Simmons v. United States, 390 U.S. 377 (1968). In Neil v. Biggers, 409 U.S. 188 (1972), the Supreme Court held that a

12

reliable identification procedure, even though suggestive, will not negate an identification of the defendant.  The factors determining whether the procedure was too suggestive to accept as reliable were determined to be the following:

> (1)  the opportunity of the witness to view the criminal at the time of the crime;
>
> (2)  the witness' degree of attention;
>
> (3)  the accuracy of the witness' prior description of the criminal;
>
> (4)  the level of certainty demonstrated by the witness at the confrontation; and
>
> (5)  the length of time between the crime and the confrontation.

Id. at 199.

Physical or photographic lineups are the preferred methods of identification.  Either procedure has been determined to be much less suggestive than a "showup," where the victim is either presented with a suspect or a single photograph of the suspect.  State v. Terry M. Henderson, No. 01C01-9401-CR-00012, slip op. 5 (Tenn. Crim. App., at Nashville, Oct. 6, 1994), app. denied, (Tenn., Jan. 3, 1995).  A showup consisting of a one-on-one confrontation between an eyewitness and a defendant, while not ideal, may meet constitutional guidelines if conducted on-the-scene within a short time of the offense.  Johnson v. State, 596 S.W.2d 97, 103 (Tenn. Crim. App. 1979) (citing Russell v. State, 489 S.W.2d 535 (Tenn. Crim. App. 1972); Bracken v. State, 489 S.W.2d 261 (Tenn. Crim. App. 1972)).  "[T]he United States Supreme Court and this Court have repeatedly condemned the use of showups to establish the identification of a person suspected of committing a criminal offense unless (a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime."  State v.

13

Thomas, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989) (footnotes omitted); State v. Moore, 596 S.W.2d 841 (Tenn. Crim. App. 1980); State v. Robert L. Ware, Jr., No. M-94-161 (Tenn. Crim. App., at Knoxville, July 18, 1995), app. denied, (Tenn., Jan. 8, 1996).  A showup is sometimes considered reliable because of the temporal proximity to the offense; it "'fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh.'"  Moore, 596 S.W.2d at 844 (quoting Bates v. United States, 405 F.2d 1104, 1106 (D.C.Cir. 1968)).

The trial court found the showup to be properly conducted and concluded that the identifications were reliable.  Each witness had an opportunity to view the defendant under circumstances that would indicate attentiveness.  The sound of gunshots alerted both Ms. Seay and Ms. Parker to the incident in the bank parking lot.  Ms. Seay, who stood within twenty-five feet of the defendant Wilkerson, recalled many details about his actions and the weapon he carried and was quite certain about the accuracy of her identification.  Ms. Parker's description of Wilkerson was also consistent with her prior statements and she expressed certainty about the identity of the defendant Wilkerson.  The showup was conducted within an hour of the shooting.  In this instance, the witnesses did not speak to each other about what each had observed.  Each made an identification independently.  Neither witness identified Murphy.  In our view, the evidence does not preponderate against the trial court's findings.  In consequence, we find no error by the admission of the showup identification testimony of Ms. Seay and Ms. Parker.

Clearly, the Gibson Drive showup was suggestive.  The defendants were handcuffed and sitting in police cars, the witnesses had discussed what they

14

had seen, and their identifications were not entirely independent. By the use of the factors in Neil v. Biggers, however, the showup was not so suggestive as to create a likelihood of a misidentification. Both witnesses had an opportunity to view the men and had clearly focused their attention on their actions. Ms. Fought and Pangburn provided police with consistent descriptions, although they were not particularly detailed. Officer Sheffield testified that each witness positively identified the defendants within thirty minutes of the initial sighting. The trial court made extensive findings. The evidence supports the ruling. In our view, the showup identification testimony of Ms. Fought and Pangburn was properly admitted at trial.

The defendant Wilkerson has also contended that the showups deprived him of his Sixth Amendment right to counsel. He argues that a defendant has a right to counsel at a lineup identification after arrest without a warrant, citing Greer v. State, 443 S.W.2d 681, 686 (Tenn. Crim. App., 1969) and State v. Mitchell, 593 S.W.2d 280, 187 (Tenn. 1980).

The trial court ruled on this ground as follows:

> [A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time the adversary judicial proceedings have been initiated. And that has been interpreted ... in Tennessee [to be] when a person is taken before a magistrate and a warrant is issued, which was considered ... a formal charge.
> ***
> So the Court is of the opinion, ... that the ... right to counsel had not attached at the time of this showup that was within one hour of these men becoming suspects. So that ... will also be respectfully overruled.

A defendant has the right to counsel at all "'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality.'" Maine v. Moulton, 474 U.S. 159, 170

15

(1985) (quoting United States v. Wade, 388 U.S. 218, 224 (1967)); Mitchell, 593 S.W.2d at 286. In Tennessee, an arrest warrant, or a preliminary hearing if no arrest warrant is issued, or an indictment or presentment, when the charge is initiated by the grand jury, marks the initiation of criminal charges to which the Sixth Amendment right to counsel attaches. Mitchell, 593 S.W.2d at 286; State v. Frasier, 914 S.W.2d 467 (Tenn. 1996). Because no formal criminal charges for these offenses had been initiated against Wilkerson, he did not have an unconditional right to have counsel present at the showup. Mitchell, 593 S.W.2d at 287. In consequence, there was no violation of his Sixth Amendment right to counsel.

II

The defendants challenge the trial court's instruction to the jury on parole eligibility. Each contends that Tenn. Code Ann. § 40-35-201(b)(2) is unconstitutionally vague, violates due process by depriving the defendants of a fair and impartial jury, and infringes on constitutionally mandated separation of powers. The state responds that the statute is constitutional and the issue is waived because the defendants requested this instruction.

The defendants requested a charge as to the range of punishment, Tenn. Code Ann. § 40-35-201(b)(1), but objected to a charge on release eligibility, Tenn. Code Ann. § 40-35-201(b)(2). The trial court refused to alter the instruction and gave it in its entirety.

For the offense of especially aggravated robbery, the defendants would qualify for a sentence of between fifteen to twenty-five years and could be eligible for parole after serving as little as 1.77 years. Upon a conviction for first degree murder, the defendants would receive a life sentence and could be eligible

16

for parole after twenty-five years. If convicted of theft, the defendants could be parole-eligible upon serving 0.24 years of a possible sentence between two and four years.

The trial court also charged facilitation as lesser included offenses. If convicted of facilitation to commit especially aggravated robbery, the defendants could serve a sentence between eight to twelve years but could be eligible for release in as little as 0.94 years. For facilitation to commit first degree murder, the defendants were subject to a sentence of fifteen to twenty-five years and might be eligible for parole after a service of 2.95 years. Convictions for facilitation of theft would result in a sentence of one to two years and possible parole eligibility after service of 0.20 years. Finally, the court instructed that a joyriding conviction carried a sentence of eleven months and twenty-nine days. The jurors were instructed that they could "weigh and consider the meaning of a sentence of imprisonment."

In <u>State v. Howard E. King</u>, ___ S.W.2d ___, No. 02S01-9703-CR-00021 (Tenn., at Jackson, July 6, 1998), the defendant challenged the constitutionality of Tenn. Code Ann. § 40-35-201(b)(2) (Supp. 1994), claiming the statute violated separation of powers and due process. Slip op. at 5. The court upheld the statute:

> We conclude that Tenn. Code Ann. § 40-35-201(b)(2) does not violate the Separation of Powers Clauses of the Tennessee Constitution. Neither is the statute impermissibly vague, nor does it require a misleading jury instruction. Additionally, we are satisfied that the jury based its verdict upon the law and evidence, in accordance with the instructions of the trial court. Thus, we find that neither the Due Process Clause of the United States nor the Tennessee Constitution was violated by the jury instruction given pursuant to the statute.

<u>Id.</u>, slip op. at 17. The court was careful to limit its holding to the circumstances of

17

the case:

> Significantly, [the jury members] were additionally instructed that they were not to attempt to fix punishment for the offense and that the sentencing information was "for your information only." <u>When the trial court explains, as it did here, that the sentencing, parole, and early release information is not to be considered in the determination of guilt or innocence, then certainly no due process violation has occurred.</u>

<u>Id.</u>, slip op. at 16 (emphasis added); <u>but see</u> <u>State v. Jason M. Weiskopf</u>, No. 02C01-9611-CR-00381, slip op. at 7 (Tenn. Crim. App., at Jackson, Feb. 4, 1998), <u>app. pending</u>, (May 6, 1998).

In <u>Weiskopf</u>, this court found plain error in the jury charge because the jury was instructed they could "weigh and consider the meaning of a sentence of imprisonment." <u>Weiskopf</u>, slip op. at 8. Under our law, the jury determines the guilt or innocence of the accused but does not determine the length of imprisonment. <u>Id.</u>; Tenn. Code Ann. § 40-35-201(a). Such an instruction is constitutionally infirm because the jury is permitted to base its decision on information other than that adduced at trial. <u>Weiskopf</u>, slip op. at 9.

Erroneous jury instructions do not constitute reversible error in every instance, however. <u>State v. Bush</u>, 942 S.W.2d 489, 505 (Tenn. 1997). In <u>Weiskopf</u>, the primary issue was the degree of homicide. <u>Weiskopf</u>, slip op. at 9. The court found harmful error because it could not conclude that the "ridiculously low, earliest release eligibility dates of 1.06 years and 0.21 years for second degree murder and voluntary manslaughter, as compared to the earliest release eligibility date of twenty-five (25) years for first degree murder ... had no impact upon the jury ...." <u>Id.</u>, slip op. at 10.

Here, the trial court charged the jury with the same instruction

18

provided in Weiskopf, i.e., that the jury may "weigh and consider the meaning of a sentence of imprisonment." The primary issue for the jury was identity, not the degree of homicide. The state presented a strong case which consisted of numerous eyewitnesses who testified confidently and consistently as to what each had observed. The state presented numerous items of physical evidence, including palm prints, clothing, and photographs of the stolen vehicle. The proof included the murder weapon, which contained three spent casings, bullet fragments from the victim's car that were conclusively fired from the murder weapon, and the proceeds of the robbery still contained in locked "Rivergate 8" bank bags. The defendants presented no proof. In our view, this was not a case in which the jury may have imposed a guilty verdict for felony murder in order to ensure the defendants served a greater sentence. Thus, the instruction was harmless beyond a reasonable doubt. See State v. Michael Dinkins, No. 02C01-9702-CE-00075 (Tenn. Crim. App., at Jackson, Mar. 12, 1998) (holding that charging the parole eligibility instruction was harmless error).

III

The defendant Murphy contends that the evidence is insufficient to support the verdicts of guilt for especially aggravated robbery and felony murder. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the

19

crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

At the time of the offenses, felony murder was defined under the 1989 Act as "a reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 1994). To sustain a conviction for felony murder, "the killing must have been in pursuance of, rather than collateral to the unlawful act described by the statute." State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988). The death of the victim must have had "an intimate relation and close connection with the felony, ... and not be separate, distinct, and independent from it ...." Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is robbery "[a]ccomplished with a deadly weapon; and ... [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a).

The mental state of intentional is satisfied "when it is the person's conscious objective ... to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). One is reckless "when the person is aware of but consciously disregards a substantial and unjustifiable risk [and to do so] constitutes a gross deviation from the standard of care that an ordinary person would exercise ...." Tenn. Code Ann. § 39-

20

11-302(c).

Accomplice liability provides a basis for conviction of the defendant Murphy. Tenn. Code Ann. § 39-11-302(a). In State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994), this court held that the statute attaching criminal liability for the conduct of another requires the culpable mental state of intent. Knowing, reckless, and negligent mental states are insufficient. Id. For the evidence to be sufficient to sustain a conviction under the criminal responsibility for the conduct of another statute, there must be proof that the defendant intended, as defined in Tenn. Code Ann. § 39-11-302(a), to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense. Tenn. Code Ann. § 39-11-402(2). In addition, there must be proof that the defendant solicited, directed, aided, or attempted to aid another to commit the offense. Id. An aider and abettor under our code may be held responsible not only for the intended criminal offense but also for any other crime committed by an accomplice as a "natural and probable consequence of the crime originally aided and abetted." State v. Carson, 950 S.W.2d 951, 952 (Tenn. 1997).

Taking the facts in a light most favorable to the state, a rational trier of fact could have found that the defendant Murphy stole the Cutlass for the purpose of committing a robbery. He then drove the vehicle to the bank parking lot and stopped quickly next to the victim's car so that the defendant Wilkerson could shoot the victim and grab the bank bags. Murphy fled the scene in the stolen vehicle with Wilkerson and the proceeds. Several blocks away, Murphy hurriedly abandoned the vehicle and Wilkerson hid the contraband. Murphy ordered Wilkerson, "hurry up."

The jury may infer the intent of the accessory from his "presence,

21

companionship, and conduct before and after the offense ...." State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982). Murphy's intent to rob the victim may be inferred from his actions in stealing and driving the car, stopping beside the victim, making a getaway, waiting for Wilkerson to hide the proceeds and weapon, and attempting to evade authorities. In our view, a rational trier of fact could have found Murphy guilty as an accomplice to especially aggravated robbery and first degree felony murder.

IV

The defendant Murphy also maintains that the trial court erred by admitting a "life photograph" of the victim. The state responds that the photograph was properly admitted to prove the identity of the victim.

The admissibility of photographs is governed by Tenn. R. Evid. 403. See State v. Banks, 564 S.W.2d 947 (Tenn. 1978). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." Tenn. R. Evid. 403. The evidence must be relevant and its probative value must outweigh any prejudicial effect. Banks, 564 S.W.2d at 950-51. Whether to admit the photographs is within the discretionary authority of the trial court and will not be reversed absent a clear showing of an abuse. State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985). Photographs of homicide victims, while alive, should not be admitted at trial unless relevant to a material issue; however, such an error is almost always harmless. See, e.g., State v. Strouth, 620 S.W.2d 467 (Tenn. 1981).

In our view, the "life photograph" was improperly admitted.   "[I]t added

22

little or nothing to the sum total of knowledge of the jury." See State v. Christopher S. Beckham, No. 02C01-9406-CR-00107, slip op. at 19-20 (Tenn. Crim. App., at Jackson, Sept. 27, 1995) (remanded for sentencing). In Beckham, where photographs of the deceased victim prior to death were admitted, this court recognized that the "evidence appears to have been offered by the prosecution for the sole purpose of invoking the sympathy of the jury." Beckham, slip op. at 20. Nonetheless, in context of the record as a whole, the error was found to be harmless. Id. We reach the same conclusion here. Although the photographs of the victims prior to their deaths usually have no probative value, we cannot say that the trial court so abused its discretion by their admission so as to have affected the verdict.

V

The defendant Murphy argues that the trial court improperly allowed prosecution witness Newland to testify and, alternatively, that the trial court should have granted him a continuance. The state, however, maintains that the defendant was provided with a summary of Newland's expected testimony three days prior to trial and had an opportunity to interview Newland before he testified.

Murphy relies upon Tenn. Code Ann. § 40-17-106, which creates the duty for the district attorney general to endorse on each indictment or presentment the names of the witnesses he intends to summon for the state. It is well settled in Tennessee that this provision is directive, rather than mandatory. State v. Hutchison, 898 S.W.2d 161, 170 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992); State v. Street, 768 S.W.2d 703, 711 (Tenn. Crim. App. 1988); State v. Crabtree, 655 S.W.2d 173, 177 (Tenn. Crim. App. 1983); Thomas v. State, 465 S.W.2d 887, 889-90 (Tenn. Crim. App. 1970). The purpose of this section is to limit

23

the possibility of surprise and to provide the defendant a basis upon which to prepare a theory of defense against his accusers. State v. Melson, 638 S.W.2d 342, 364 (Tenn. 1982); Street, 768 S.W.2d at 710-11; State v. Roberson, 644 S.W.2d 696, 699 (Tenn. Crim. App. 1982). The failure to list or provide the names of witnesses neither disqualifies the witness nor entitles the defendant to relief, unless prejudice can be shown. Hutchison, 898 S.W.2d at 170; Harris, 839 S.W.2d at 69; Roberson, 644 S.W.2d at 699. "In this context, it is not the prejudice which resulted from the witnesses testimony but the prejudice which resulted from the defendant's lack of notice which is relevant...." State v. Jesse Eugene Harris, No. 88-188-III (Tenn. Crim. App., at Nashville, June 7), app. denied, (Tenn., Aug. 7, 1989). Because Murphy had notice of the content of Newland's testimony and had an opportunity to interview him, we find no prejudice.

The law addressing Murphy's alternative contention, the grant of a continuance, is also well settled. The grant or denial of a continuance rests within the sound discretion of the trial court. State v. Seals, 735 S.W.2d 849, 853 (Tenn. Crim. App. 1987). Its determination will not be overturned unless there is "a clear showing of an abuse of discretion, to the prejudice of the defendant." Woods v. State, 552 S.W.2d 782, 784 (Tenn. Crim. App. 1977); Frazier v. State, 466 S.W.2d 535, 537 (Tenn. Crim. App. 1970). Murphy had knowledge of Newland's testimony and an opportunity to interview him. In this instance, the trial court did not abuse its discretion.

VI

Murphy and Wilkerson challenge the length and manner of service of their sentences. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a

presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987). The record in this case demonstrates that the trial court made adequate findings of fact.

In calculating the sentence for felony convictions committed before July 1, 1995, the presumptive sentence is the minimum within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c) (1990) (amended July 1, 1995 to provide that the presumptive sentence for a Class A felony as the midpoint in the range). If there are enhancement factors but no mitigating factors, the trial court may set the sentence above the minimum. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a

means of increasing the sentence.  Tenn. Code Ann. § 40-35-210.  The sentence may then be reduced within the range by any weight assigned to the mitigating factors present.  Id.

At the sentencing hearing, the trial judge found that Wilkerson and Murphy have a history of criminal behavior in addition to that necessary to establish the appropriate range of sentencing.  Tenn. Code Ann. § 40-35-114(1).  As to Wilkerson, the court found that he had a history of unwillingness to comply with the conditions of a sentence involving release to the community.  Tenn. Code Ann. § 40-35-114(8).  The court stated that it gave a "great amount of weight" to these enhancement factors, found no mitigators and imposed maximum sentences of twenty-five years for especially aggravated robbery and four years for theft.

We affirm the imposition of the maximum sentence for theft.  The trial court, however, erroneously applied Tenn. Code Ann. § 40-35-210(c) (1995), not yet in effect at the time these offenses were committed, to enhance the sentence for especially aggravated robbery.  That statute provides that the presumptive sentence is the midpoint in the range rather than the minimum.  Thus, there is no presumption of correctness as to the sentence imposed for the Class A felony of especially aggravated robbery.  Our review of that sentence must be de novo.

The defendant Murphy has an extensive criminal history.  As a juvenile, he was placed in an intervention program for malicious destruction of property and truancy.  He also committed third degree burglary and was placed on probation.  The same year he was adjudicated for malicious destruction of property, grand larceny, and violation of probation.  As an adult, he incurred a plentitude of charges, many of which resulted in convictions.  For example, he was convicted of

possession of a weapon with intent to go armed in 1989, reckless endangerment and two instances of theft of property in 1991. In 1993, he was convicted of several counts of theft and placed on probation. The instant offenses occurred in 1994, while he was on probation. Murphy refused to provide any information regarding his mental or physical health or employment or family background.

The defendant Wilkerson also has a lengthy criminal record. In 1991, he was arrested and convicted of resisting arrest and driving on a suspended license. He also accumulated misdemeanor convictions for theft of property, possession of a weapon, driving on a revoked license, criminal impersonation, and a probation violation. Wilkerson left school in the tenth grade and has a history of marijuana, cocaine, heroin and alcohol abuse. He admitted to selling cocaine as his livelihood.

The defendants' sentences for especially aggravated robbery warrant enhancement. Wilkerson has a history of criminal convictions and criminal behavior, Tenn. Code Ann. § 40-35-114(1), and a history of unwillingness to comply with conditions of a sentence involving release to the community, Tenn. Code Ann. § 40-35-114(8). Murphy likewise has a history of criminal convictions and behavior, Tenn. Code Ann. § 40-35-114(1), and he was on probation while these offenses were committed, Tenn. Code Ann. § 40-35-114(13). Beginning at the minimum in the range, which is fifteen years, and giving great weight to these enhancement factors, we arrive at a sentence for each defendant of twenty-one years for especially aggravated robbery.

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in

Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[1] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising

---

[1] The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

28

from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation;

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, as now defined by subsection (b)(4) in the statute, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses.

In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The Wilkerson decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." Wilkerson, 905 S.W.2d at 938.

The trial court ordered the defendants to serve each sentence consecutively, including the life sentence, for an effective sentence of life plus

twenty-nine years. The trial court found Wilkerson to be a dangerous offender with an extensive criminal history who had no regard for human life. Tenn. Code Ann. § 40-35-115(b)(2), (4). As for Murphy, the court ruled that he had an extensive criminal history and committed the offenses while on probation. Tenn. Code Ann. § 40-35-115(b)(2), (6). In our view, the court's decision to impose consecutive sentences is more than adequately supported by the record. These offenses involved aggravating circumstances and the length of sentence is reasonably related to the severity of the crimes involved which resulted in a senseless and random loss of life. That the defendants committed a crime of violence with the use of a weapon justifies a lengthy period of incarceration in order to protect the public from future harms.

Accordingly, the judgment of the trial court is affirmed. The defendants' sentences for especially aggravated robbery are modified to twenty-one years. As a result, the effective sentence for each defendant is life plus twenty-five years.

_____
Gary R. Wade, Judge

CONCUR:

_____
Thomas T. Woodall, Judge

_____
L.T. Lafferty, Special Judge

30